Good morning everyone. The first case this morning is number 08-3307, Sipe v. Navy. Mr. Hendricks. Good morning. I'd like to reserve five minutes of my time for rebuttal. Please proceed. May it please the Court, my name is Merle Hendricks and I'm representing Petitioner Myron Sipe. This is a case about a real whistleblower, Myron Sipe, who took the risk and made protected safety disclosures. This is a case about Mr. Sipe, a Navy engineer, a whistleblower, who documented and reported multiple safety violations at the Sassapo fuel facility. He also documented the improper use of Navy materials on the residence of a Navy commander. On this record, if Mr. Sipe is not protected from the actions of the Navy when they terminated his assignment in Japan, an extraordinary move that they had never done at any other time, and then sent him home, he's not protected from that based on the Whistleblower Protection Act, then those protections are rendered illusory for all federal employees. But how do you overcome the findings of fact that were made by the administrative judge? The administrative judge failed to properly apply the law of this court, Your Honor. He failed to properly apply the car test, failed to analyze the retaliatory motive, failed to analyze the evidence. It's a clear and convincing evidence standard. And instead the judge said, well, if I just turn my back and pretend that there's no whistleblowing and look at the evidence with no whistleblowing in it, I think I could sustain this. It's a misappropriation, a misapplication of the car standard. It's an error of law, Your Honor. Well, and of course this is the problem. There was evidence that the Navy perhaps felt that Mr. Sipe wasn't. And that evidence was derived, and the testimony of Mr. Hanley was, that his co-workers became uncomfortable when he started taking pictures and documenting safety reports. Mr. Hanley's testimony is in the record. It's cited in the joint appendix. Mr. Hanley was the number one personnel person. He was a top advisor to the captain who made this decision. And he testified very clearly that this was a problem and that the unrest among some of the employees, because there are no performance issues here. There's no question of Mr. Sipe's competency as an engineer. This is only about supposedly he couldn't fit in with the overseas environment. Now, it's an interesting letter, if you look at the letter that they sent him home, failure to adapt to the overseas environment. Now, you and I might not adapt to the overseas environment in Japan. Mr. Sipe is married to a Japanese national. He speaks Japanese. He specifically sought out this assignment so that they could be close to her family. He was very into the Japanese culture, and yet they never really explained what they mean, because they don't know what they mean because it's a smoke screen. It's a smoke screen for the fact that they were being told that there were these safety violations, and if they didn't do something about it, Mr. Sipe would take it outside of the command, and they were afraid of that. So they sent the military police and took him off the base. Mr. Sipe met with the captain, the captain that removed him, in Sasebo in mid-February. Three weeks later, they sent him a letter and said, you're being sent home. They discussed the safety violations at that time, and the captain said, well, I don't know if these safety violations are serious or not. Mr. Hendricks, Japan is the place I find I have to be most careful of cultural differences. I teach there several weeks every year, and I find there is vast difference. There's a finding that that difference was dispositive here. He was unable to deal with that difference. How do we accommodate your argument to the fact that the facts found, which we must honor, are different from what you characterize? Well, the defense that the Navy is trying to use here, the statutory defense, requires clear and convincing evidence that absent the whistleblower disclosures, they would have taken the same action. This is an extraordinary action. This is not an ordinary reassignment. They had never, ever done this. Also the testimony of Handley, the testimony of the captain. This is not a situation where you're dealing with an ordinary personnel. They did something extraordinary. What made Myron Sipe extraordinary? He was a whistleblower. People didn't like him. He ruffled feathers. People didn't like the fact that he was exposing this facility. You have to understand what the Sasebo facility is. It's a huge fuel facility. It was taken over from the Japanese Imperial Army after World War II. They have these huge tanks, the size of football fields inside, and many stories deep. They have to be properly maintained, and they have highly flammable fuel, and they weren't being dealt with properly. The maintenance wasn't being done properly. There were a number of things that he documented. He documented rust, corrosion, and all kinds of issues in a report that's part of the record. So the fact of the matter is there is not the requisite independence. They not only have to prove that they might have done this based on some factual evidence, they have to show that that evidence is independent of the whistleblowing. The judge never really analyzed that. There is no real analysis. If you're satisfied that the evidence is independent of his whistleblowing, then I guess you're left with the defense is sustained. But it has to be clear and convincing. The testimony of the Navy officials is that this kind of action has never been taken before. You suggested that there was a, while your argument has mostly gone to factual disagreement with the finding of the board, you suggested there was a legal error. What was the legal error? The legal error is that they failed to apply the clear and convincing standard that is this court's standard. It's the standard in the statute, and it's the standard that the Carr case, the tripartite standard there. They have to show, by clear and convincing evidence, that this action was independent of the whistleblowing activity. The only problems anybody had with Myron Sipe were that they were upset with him because of his whistleblowing, because he was reporting and taking pictures of all these conditions that were wrong at the Sassapoe Fuels Terminal. One of his disclosures had to do with the improper use of fuel nozzles in aircraft in a mobile refueler. This mobile refueler was used to refuel helicopters that came to Sassapoe. Instead of having the proper nozzle there that had a regulator that kept the pressure down to 55 psi, they had one that was over 200. During the time period when this was going on, U.S. Ambassador Baker flew through. His helicopter was fueled using this refueler, and the fuel bladder burst. That's in the record. These are safety violations that could have had serious consequences. Thank goodness no one was actually hurt. There are all kinds of issues here about safety that were disregarded by the management. Mr. Sipe was the engineer on the site. He was brought in to try to upgrade these facilities, and some of the people who were there didn't like it. Those people included Mr. Nelson. But Captain Abramowitz is in charge of this base, right? Yes, he was. There's probably nothing a military officer can do to get himself dismissed quicker than to overlook a safety problem. If any injury were to happen on his watch due to his failure to protect the safety... I'm trying to figure out why Captain Abramowitz would object to receiving this kind of information. This is the best thing that could happen for him, isn't it? I would think so. What's his motivation then, in other words, for firing Sipe? His motivation for firing Sipe is that he's listening to the people who are complaining. He is supposed to take these safety disclosures and evaluate them. Remember, they're protected disclosures if there's a reasonable basis for them. You look in the file, look in the pictures that are there, there's clearly a reasonable basis for them, and instead they just said, we're not going to do anything with them. I think his concerns may have been purely budgetary, that he'd come on to this and then he was concerned about how much money this was going to cost to fix, and he didn't want it. I don't know. Captain Abramowitz testified that he did take into account the whistleblowing when he made the decision to send Sipe home, and he thought that that would be the best resolution. This is an extraordinary thing that they did. They had never done it before. There's no record that they've done it since, and the thing that makes Myron Sipe unique is his whistleblowing. Now, the safety disclosures were not found to be whistleblowing disclosures, right? The safety disclosures were never ruled on. Why weren't they? They were never ruled on. The judge stopped short. He found other protective disclosures and said, I don't have to go any further. We think, Your Honor, that that was also an error, and the board let him get away with that. We briefed that to the board, and they passed it right by. But the safety disclosures— Was it argued by the government that they were not whistleblowing? Yes, the government argued that it was not whistleblowing. In fact, the government, in its brief now, says that they don't concede that he made protective disclosures. One of the disclosures that the judge did find was an air conditioning unit that was taken out of somewhere and put into the house of Commander Brown, who was not part of the command, for his personal benefit. I mean, there are specific things that the A.J. Below did find, and those things relate to misappropriation of funds. The safety disclosures are documented. They're part of the record, and I see that I've used my time for argument. I think we'll hear from the other side. Unless there are any more questions at the moment, could we have your rebuttal time? May it please the Court. The Court should affirm the board's decision because substantial evidence supports its conclusion that the Navy would have directed Mr. Sipes' return to the United States even absent his protective disclosures. Well, there's something very curious about all of this. If, for example, somebody is deemed not up to the job, that you have the military police escort him off the base. There's evidence in the record. The record suggests strange behavior that doesn't fit in with the routine evaluation of an employee who's not as competent as perhaps the job requires. Well, in this case, not only was there a problem with Mr. Sipes' competence and his ability to supervise the master labor contractors or Japanese workforce over which he had responsibility, but there was also testimony or evidence in the record that he had acted somewhat irrationally. Someone had indicated that he had a gun, and if you look at page 5266 of the joint appendix, you'll see that in an email from Mr. Hanley, who was the executive director and the head of civilians, he said that the reason they sent armed guards was because there was some concern that he could harm himself or others. That's the reason that was done here. You're reading from the record before the MSPB? That's correct, and it's also in the joint appendix. Now, with respect to the board's application of the clear and convincing standard, there's no question that the board applied it. The administrative judge here spent 46 pages documenting the evidence of record and going through each of the three so-called Carr or Geier factors, and the board relied most heavily on the two Carr factors that required the agency to show that there was strong evidence that the personnel action was warranted, even absent the disclosures, and showing that there was no motive to retaliate by the deciding officials in this case. The judge found that all 13 precipient witnesses, including Mr. Sipes and two witnesses that he brought in on his own behalf, testified that Mr. Sipes and the master labor contractors, or the Japanese workforce in this case, could not work together. The problems with these master labor contractors preceded Mr. Sipes' protective disclosures. Mr. Sipes came on at Sasebo in April 2002, and he had problems with the workforce right from the start. In addition, he acknowledged to Captain Abramovich when he met with him in February 2003 that he had a problem supervising these master labor contractors. In addition, there is ample evidence in the record from individuals who could not have had a motive to retaliate that Mr. Sipes could not get along with the people he was charged with supervising. Captain Bogdanovich, who the administrative judge found to be very credible, said that the employees had problems with chain of command and that he had complaints from employees separate and apart from the disclosures that Mr. Sipes had made. If, in fact, looking at the issues that were raised in the complaints of safety violations and so on, if in fact these violations are being committed because of a lax atmosphere at the site, then when someone comes in with a stricter standard, naturally they'll encounter resistance. Under another set of circumstances that might be the case, Your Honor, but here the evidence showed that the workforce, when Mr. Sipes came on, was happy that he was there. They were happy that they had somebody with the engineering experience. In addition, the problems that Mr. Sipes had didn't have to do with the fact that he was identifying safety problems or maintenance that needed to be done or corrections. That was his job. We're not saying that his disclosures were not protected, but what we're saying is it was his job to identify these safety problems and to solve them. His inherent problems with dealing with the Japanese workforce made it almost impossible for him to get any of these things done. But if the disclosures were protected, and I think we need to, for the sake of resolution, assume that they were, then, and at the same time, the MSPB said, never mind, I'm not going to look at the substance of the disclosures. There's a flaw there, isn't there? Because if in fact protected disclosures were made, don't you have to look with a different eye and on different premises to the response that the authorities made? In this case, although the administrative judge decided by virtue of the timing and knowledge test that the disclosures were protected and were a contributing factor, that doesn't mean that he didn't take them into account when he reviewed the evidence and determined that there was clear and convincing evidence that they were not a factor in the personnel action. The administrative judge expressly found that although these safety disclosures were documented and that they were potentially protected disclosures, he found that they had nothing to do with Mr. Seip's, with the order to send Mr. Seip back to the United States. He made that express finding. He found that Captain Abramovich, the captain who ultimately made the decision, did extensive investigation to determine whether or not the problems that were going on in Sasebo had to do with the fact that Mr. Seip was making these protected disclosures and could find nothing to substantiate that. Further, here there has to be a retaliatory motive by the deciding official. Captain Abramovich didn't start until July of 2002, which was around the same time that Mr. Seip started. These safety disclosures didn't reflect badly upon him, and as Judge Rader pointed out, it was his job to make sure that safety problems didn't result in some sort of explosion or another tragedy that could have reflected badly upon the entire installation in Japan. In addition, it was well documented... As you know, of course, the fact that the particular decision-maker doesn't have a direct motivation isn't a complete answer. That's correct. Mr. Seip makes the cat's paw argument, and that is a scenario that does arise from time to time in which the deciding official may have been influenced by people who do have a motivation, and the decision may be, in a sense, compromised. The independence of the decision may be compromised by that fact. That's part of Mr. Seip's argument here. Yes, it is part of Mr. Seip's argument, and the administrative judge considered that argument and rejected it as well. The cat's paw or rubber stamp theory only comes into play when the deciding official is influenced by a supervisor or somebody else who has the ability to make a recommendation to take action. There has to be... In the EEOC v. BCI Coca-Cola bottling case and in the MSPB's Russell case, you have to show that but for a complaint by the subject of the protected disclosure, this deciding official would never have known about this, that they caused the personnel action by bringing something up because they were the subject of the protected disclosure. Here, it's undisputed that Mr. Nelson, who was Mr. Seip's direct supervisor, did complain, but that was not the reason that the investigations were undertaken. The master labor contractors were walking out of meetings. The military personnel were complaining about Mr. Seip. That caused Captain Abramovich to undertake an independent investigation, and that's key under these cat's paw and rubber stamp theories. If it were the whistle that one of the officials of the military had installed a government air conditioner in his home, naturally that person isn't going to be enchanted with the disclosure. When you say the military personnel were complaining, I would think so, if he was reporting this sort of infraction. I need to clarify then, Your Honor. I'm not talking about the military personnel who were the subject of the disclosures, and that was just one, Commander Brown. He was completely excluded from the process. I'm sorry, Captain Abramovich recognized that he had a motive to retaliate and kept him out of the process whatsoever. I'm talking about... But you're asking us to assume that everything was pristine and immaculate that wasn't identified by Mr. Seip. When you say no one else had anything to complain about, we can't find that that was the only infraction, but nor, I think, can one require the assumption that there was only one such infraction, and therefore all of the other concerns raised by the military personnel were supported. There was no evidence of record to support Mr. Seip's claim that the other military personnel... I'm not even sure he... Mr. Seip only claimed that Commander Brown, Mr. Nelson, and Mr. Kinoshita had a retaliatory motive. The question is, was Mr. Seip a whistleblower? And it does seem it would be very hard to say otherwise. And on that assumption, at least for the purposes here, once you have that assumption, don't you have to look at everything else that transpired in the context that he was known to be a whistleblower? Yes. A complainer, a perfectionist, or whatever else. Yes, Your Honor, and that's exactly what happened here. Once the protected disclosures were made, and in the context of all these other problems Mr. Seip was having, Captain Abramovich sent Commander Senf down to Sasebo to do an investigation. Mr. Senf talked to everybody involved, people who were the subject of the disclosure, people who were not the subject of the disclosure, and he found that separate and apart from Mr. Seip's problems, Mr. Seip would not have been able to accomplish his objectives because he could not work with the Japanese workforce. They did not trust him, and it wasn't because he was taking pictures. It was because he couldn't interact with them. He would close the door on them. He would tell one Japanese employee that another Japanese person didn't like him. Mr. Yasunaga, who was the interface between the American employees there and the Japanese, was one of the people who testified and persuaded Captain Abramovich that these problems were not going away. Captain Abramovich didn't just summarily dismiss Mr. Seip after he made his protected disclosures. There was an investigation, and Mr. Senf had said we need to do something here, but at that point Captain Abramovich still didn't do anything. It wasn't until he went down to Sasebo himself and talked to Mr. Seip and looked at all of his allegations and talked to some of the Japanese workforce, Mr. Yasunaga and, yes, Mr. Kinoshita, who did have somewhat of a motive, but Captain Abramovich, when the day was over, decided that even though Mr. Seip had engineering skills that this fuel installation really needed, it was his inability to get along and to supervise. Is it accurate that there were no findings at the MSPB with respect to whistleblowing? No, the MSPB did find that Mr. Seip had made a protected disclosure and that it was a contributing factor in the personnel action, but what the court has to consider here is whether or not the agency or the Navy showed by clear and convincing evidence that the agency, that it would have taken the same action even absent the protected disclosure. That's really what's at issue here. There's no question that Mr. Seip was a whistleblower, but after six days of hearings and listening to 13 witnesses and looking at a lot of documentary evidence, the administrative judge here found that with an abiding conviction that the protected disclosures that Mr. Seip made were not the reason why he was sent back to the United States. It was because he had serious problems supervising. He was a good engineer, but he could not supervise. I mean, Mr. Gladson said he was unable to manage the MLCs or the Master Labor Contractors because to the point where they walked out of meetings. Mr. Hanley said he couldn't lead the workforce. They needed clear direction, and Mr. Seip provided conflicting information and isolated himself from the workforce. Mr. Senf, who was sent to investigate, found that Mr. Seip advocated for change but could not affect it due to his management style. He lacked the skill to make changes, and he questioned his qualifications. Now, when he gets up, Mr. Hendricks will probably make much of the fact that Mr. Senf played golf with Mr. Nelson and had dinner with Captain Commander Brown, but he also talked to 12 or 13 other people, and his findings were independent of the fact that those people had a motive. And like I said before, Captain Abramovich had no motive here. Captain Commander Bogdanovich had no motive. The people who also had input, Mr. Yorty and Mr. Hanley, had no motive. There's no question of this. What was Mr. Yorty? It was a little unclear to me from the administrative judge's opinion exactly what role Mr. Yorty played in all of this. Did he do an independent investigation from Mr. Senf, or was it... Yes. But it wasn't, I take it, documented to the same extent as Mr. Senf. Is that fair to say? No, what happened was Mr. Yorty was a lawyer who worked with Captain Abramovich in... He was essentially Captain Abramovich. He was in the meeting with Captain Abramovich where he talked to Mr. Seif in February 2003. Captain Abramovich then said, OK, I don't like what's going on here. I don't like what Mr. Seif's telling me. He's even admitting that he's having problems with people. Mr. Yorty, you go down to Sasebo and check this out further. He had him look into the allegations further, and Mr. Yorty said, concluded that Mr. Seif's problems had nothing to do with the fact that he reported air conditioners being improperly... But this was before Mr. Senf's... No, it was after. Mr. Senf did his in October of 2002. Of 2002. Right. Yorty went down after the conversation in early 2003. That's correct. So that was between the time of the conversation, the direct conversation between Abramovich and Seif, and the time of the dismissal. Not dismissal, the time of the transfer. That's correct. Okay. Any more questions? Thank you. Thank you. Mr. Hendricks. Mr. Hendricks, you said that the problem was that we had no clear and convincing evidence here, but the administrative law judge has an entire section entitled Clear and Convincing Evidence. It goes on for a little over 20 pages, 21 to be precise, and then ends with, after careful review of all the evidence, I find that the agency has shown by clear and convincing evidence that it would have released him anyway. I don't think that clear and convincing evidence that's in there is independent of the whistleblowing activities. He went into this environment and people were upset with what he was doing. He was trying to change the status quo. Counsel for the government suggested that he had problems with all the master labor contract people. That's not true. There was one segment that he had problems with and another segment where there were no problems. There's testimony from a couple of our witnesses that there was no problems with the other segment. The segment he had problems with is the segment where Kenosha was the leader. Kenosha staged a walkout in August to try to get Mr. Sipes' authority to be undermined. He did that because he was the MLC leader. Culturally, in that culture, when the leader stands up and walks out, everybody walks out whether they believe it or not. It's just the way things are done. There was one walkout. There were not walkouts. There was one. Every problem started after the July air conditioner incident. The July air conditioner is the crux where things started going forward. The air conditioner was erroneously put in. Mr. Sipes found out about it. He reported it to the proper channels and then everything started happening. But I look at this 21 pages and it characterizes everything you're referring to slightly differently. Do I credit your version or do I have to credit the version given to me by the board? You have to credit whether this is independent evidence or not. If evidence coming from Kenosha and Ron Nelson is independent of the whistleblowing, then I believe you've just pulled the plug on whistleblower protection. Anytime you only get a whistleblower case when something bad has happened to the whistleblower. If the people who want to retaliate can retaliate and say, oh well, there were issues that we could have done this for. This is serious. This is a serious policy. Do we want people to blow the whistle or do we not want them to? Do we want them to take the risk? Mr. Sipes' career was set back years by this. He has recovered. We're now six or seven years later. But he has lost promotion potential.  being sent home from Japan. I'm still quite impressed though that the board, and it even goes into people who liked Mr. Sipes. Keith Williams liked him and said he was honest and supported his side. It weighs both sides of the evidence. It talks about Cervantes and these people who think very highly of Mr. Sipes and tried to support his case. That was weighed into the clear and convincing evidence and yet still the board found that there was an alternative reason for the effort. Well, I would remind you that clear and convincing evidence under the decisions of this course is evidence which produces in the mind of the trier effect an abiding conviction that the truth of the factual contention is highly probable. I don't see that this evidence has that. It has to be clear and convincing evidence that this was independent. There is a nexus here between what happened to Mr. Sipes and these complaints about Mr. Sipes and his whistleblowing activities. Your Honor, I'd ask you to look very seriously at that nexus because that is what I think is going on here. I also want to address the cat's paw analysis. You see, there's always going by definition whenever we get to the affirmative defense we will always have a nexus because one of the predicate findings here assumed to be the case is that the whistleblowing is a factor in the action that was taken. So you've already got some intertwining of the whistleblowing and the other causes. What the administrative judge's job is to do which I think this administrative judge at least correctly understood the assignment is to figure out whether notwithstanding that that's a factor it would have happened anyway. Yeah, but he totally messed up... So saying that they were all intertwined doesn't really help us, I think. He totally messed up one of the car factors. He said because there's no evidence that they've ever done this to anybody else so they've never treated a non-whistleblower this way then I'm going to count that in favor of the government. Since there are no comparators the only conclusion that a logical mind can draw is they're doing this in some fashion because of the whistleblowing. This is an extraordinary activity. I think the cat's paw analysis applies more strictly under this section than it does under EEO law. You can import it over here. It's clear and convincing evidence of the retaliation motion. I don't think the motive to retaliate was properly assessed. Commander Brown was consulted by lawyer Jordy when he came down for his investigation. There was no independence. Commander Brown was consulted during the March 2002 thing and that was the last thing they did before they sent him home. Commander Semp's report and it was Commander Semp not Mr. Semp was in November 2002 and nothing happened as a result of that. Commander Semp recommended that Mr. Seip be removed from supervisory duties not sent home. So to the extent that his report is cited as a basis for this action it simply doesn't support that, Your Honor. I would ask that you reverse the board. Thank you. Thank you both. Mr. Hendricks, Ms. Hofstra. The case is taken under submission.